# LIKELIHOOD OF CONFUSION BETWEEN THE COMMERCE INSURANCE COMPANY AND COMMERCE BANC INSURANCE SERVICES

## A STUDY CONDUCTED FOR WOODCOCK WASHBURN, LLP

### JUNE 2006

## RL ASSOCIATES

**601 EWING STREET SUITE A-11**
**PRINCETON, NEW JERSEY 08540**
**(609) 683-9200**
**(609) 683-0855 FAX**

CONFIDENTIAL-ATTORNEY'S EYES ONLY

TABLE OF CONTENTS

  I  INTRODUCTION                                            1
        BACKGROUND                                           1
        GOAL OF THE STUDY                                    1
        PROVING A NEGATIVE                                   2

 II  METHODOLOGY                                             3
        INTRODUCTION                                         3
        GENERAL APPROACH                                     3
        UNIVERSE AND SAMPLE                                  4
        OVERALL DESIGN                                       5
        THE USE OF CONTROLS                                  5
        QUESTIONNAIRE                                        6
        INTERVIEWING                                         7
        VALIDATION                                           9

III  DATA, DISCUSSION AND CONCLUSIONS                       10
        DATA                                                10
        DISCUSSION AND CONCLUSIONS                          11

APPENDIX A – ROTATION SHEET
APPENDIX B – LOGOS USED IN THE STUDY
APPENDIX C – QUESTIONNAIRE
APPENDIX D – MEMO TO SUPERVISORS AND INTERVIEWER
                     INSTRUCTIONS
APPENDIX E – RESUME OF MICHAEL RAPPEPORT

CONFIDENTIAL-ATTORNEY'S EYES ONLY

## I – INTRODUCTION

<u>Background</u>

Commerce Bancorp, Inc. ("Bancorp") is a banking and financial services holding company. Bancorp's branches are currently concentrated primarily in the Mid-Atlantic states (New York, New Jersey, Pennsylvania), but exist in other areas as well. One of the financial services offered by a subsidiary of Bancorp, Commerce Insurance Services ("CIS"), is the brokering of insurance. CIS's insurance services are to be sold under variations of the name "Commerce Banc Insurance Services."

The Commerce Insurance Company ("CIC") provides a variety of insurance products and services to both individuals and corporate entities in Massachusetts.

<u>Goal of the Study</u>

We have been informed by Woodcock Washburn, LLP, counsel to CIS, that CIS is planning to expand into Massachusetts, among other areas. We were also informed that CIC is concerned about CIS's expansion into Massachusetts, and its intention to provide insurance services using its name there. Specifically, counsel to CIC may believe that, because of the use of the combination of the words "commerce" and "insurance," consumers who come into contact with "Commerce Banc Insurance Services" are likely to think it is affiliated with the Commerce Insurance Company. Conversely, Woodcock Washburn hypothesizes that when consumers come into contact with CIS using the Commerce Banc Insurance Services name, they will <u>not</u> be likely to think it is affiliated with CIC.

Woodcock Washburn commissioned RL Associates to design and carry out a fair and unbiased test of this issue. In order to do this, RL Associates translated the two parties' views into the following testable "positive" hypothesis:

Consumers who come into contact with Commerce Banc Insurance Services will be likely to think it is connected or affiliated with the Commerce Insurance Company.

This is a report on the results of that study.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

## Proving a Negative

We note that from the point of view of CIS, the central issue in this study calls for us to "prove a negative," that is, CIS's hypothesis is that significant levels of confusion between the two entities will <u>not</u> occur.  It is of course impossible to <u>totally</u> prove a negative, in that there is no way to definitively "prove" that confusion will never exist under any set of circumstances.  However, we believe that a carefully designed study can provide significant evidence as to whether or not consumers are likely to perceive that two companies are affiliated.  We designed this test to provide high quality evidence in a number of ways.  For instance, we tested for confusion in two different ways[1], and we used a variety of control stimuli, thus allowing us to test the likelihood of confusion of a number of different combinations of companies.

---

[1] We varied the order in which respondents were shown the two stimuli of interest, the Commerce Insurance Company and Commerce Banc Insurance Services.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

## II – METHODOLOGY

Introduction

Before beginning our discussion of the specific methodology used in this survey, we think it is important to note that the methodology used in any survey research project involves some degree of compromise between conflicting objectives. For instance, on the one hand, there is a desire to completely control the survey process, and on the other hand, a desire to replicate actual market conditions. It is therefore important to keep in mind throughout our discussion of methodology that, of necessity, the procedures used incorporated such compromises.

General Approach

The primary objective in this case is to determine whether or not respondents who come into contact with Commerce Banc Insurance Services will be likely to think it is connected or affiliated with the Commerce Insurance Company. We decided to test the logos of the companies as consumers would see them. Thus, it was necessary to design a study in which respondents were able to see the logos of the companies at issue. Theoretically, there are three realistic approaches to showing material to the general public: in-home interviews, interviews utilizing presentation of material via the Internet, and mall intercept interviews. However, a random sample of in-home interviews is prohibitively expensive, while Internet surveys do not currently permit sufficient control of the sampling process; that is, in a study posted on the Internet potential respondents can decide they do not want to participate in a survey because of the subject matter, as opposed to just not wanting to participate in surveys in general. Fortunately, extensive testing over a wide range of survey research issues has demonstrated that the results obtained from a well-designed mall intercept study come very close to those achieved under what are considered optimum random sample conditions, but at a much lower cost. For these reasons, the general approach used in this study was mall intercept interviews. We note that regardless of whether a survey is intended for use in litigation or for use as general market research, mall intercept interviews are one of the most common ways of doing such surveys, and are generally accepted in the field as valid survey methodology.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

Universe and Sample

There are two issues related to drawing an appropriate sample:

1. Defining the proper universe from which to draw the sample.

2. Assuring the sample is drawn in such a way as to be representative of this universe.

Universe – In a study such as this, we understand an appropriate universe to be people who are likely to be actual or potential purchasers and/or users of the product at issue. Since the product at issue in this case is various forms of insurance sold to the general public, essentially every adult is a potential buyer. Accordingly, we defined the appropriate universe for this study as people who are likely to purchase or have some kind of insurance, namely, men and women 21 years old or older.

Sample Frame – As explained above, the methodology used in this study was mall intercept interviews. The specific mall locations used were geographically distributed throughout the United States. In the context of the issues in this case, we believed it useful to separately investigate three specific geographic areas:

- Massachusetts, the home market of CIC - where presumably CIC is better known than CIS

- The Mid-Atlantic states, the home market of CIS - where presumably CIS is better known than CIC

- The balance of the country, where neither CIC nor CIS currently operate, and presumably neither are well known

Therefore, projectable subsamples of interviews were conducted in these three areas, which can be looked at either individually or in combination.

Sample Selection – Interviewers were instructed to attempt to select potential respondents by approaching every third, apparently appropriately aged person who walked past them on the floor of the mall. Potential respondents were first "screened" using three qualifying requirements:

- Respondents had to be 21 years old or older

- Respondents could not have participated in an interview in any shopping mall in the past three months.

CONFIDENTIAL ATTORNEY'S EYES ONLY

- Additionally, as is standard when showing respondents something that must be looked at closely, if respondents said they use glasses or contact lenses to read, they had to have them available for the interview.

Once they had passed the screen questions defined above, and agreed to participate in the study, respondents were offered either $2.00 or $3.00, depending on the interviewing firm that conducted the interview. Respondents were then taken to a private room to be interviewed.

## Overall Design

In this study, we used a so-called "two room" survey design. In this design (which we believe reasonably reflects the sequencing in which consumers see the logos in the real marketplace), respondents are first shown one logo, and then shown a display of logos, and asked whether they perceived that any of the companies in the display were connected or affiliated with the first company they saw. Approximately half of the respondents were shown the Commerce Insurance Company logo first, and half were shown the Commerce Banc Insurance Services logo. Given the fact that we are investigating a "negative", providing a variety of situations in which respondents can be confused (any one of which can refute the "negative") is conservative from the point of view of CIS.

## The Use of Controls

As is true in virtually every perception survey, the design of this survey has to take into account potential sources of error. One type of error is artifacts arising from the survey procedure itself. This type of potential source of error is commonly referred to as "noise." The most common, although not the only, source of "noise" is that at least some respondents, rather than admit they don't have an answer to a question, will "guess" in their desire to get the "right answer." No matter how well designed a survey, it is generally impossible to guarantee that such noise has been eradicated. Therefore, there is a general need to provide a mechanism to estimate the noise. In the great majority of cases, this mechanism(s) is the use of one form or another of controls.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

The controls used in this survey are logos of existing banks and/or insurance companies in the United States that use the word Commerce in their name.  The control logos used in this study, and the website where each can be found, are:

D – Commerce Bank & Trust (www.bankatcommerce.com)[2]
E – Commerce Insurance Services, Inc. (www.commercebank.com/personal/insurance)
F – The Commerce Bank – "The bank for business" (www.tcbwa.com)
G – Bank of Commerce (www.bankcom.com)
H – Commerce Bank – Member FDIC (www.commercebankfl.com/main.htm)
I – Commerce Bank – Taking care of business (www.tncommercebank.com)

After seeing one logo in the first room, each respondent saw a display of five logos in a second room.  The five logos were arranged randomly, according to a rotation sheet we provided.  The rotation sheet is included in Appendix A.  Color copies of the logos shown to the respondents in this study are included in Appendix B.

## Questionnaire

Once respondents were in the interview facility, they were seated and, after some introductory material about not guessing, were told:

*I am going to show you the logo of a company that you may or may not be familiar with.*

Some respondents were then shown the Commerce Insurance Company logo, and some were then shown the Commerce Banc Insurance Services logo.[3]  The interviewer then asked:

Q1.  *Have you ever heard of this company before?*

If the respondent answered yes, they were asked the follow-up question:

Q2.  *What, if anything, can you tell me about this company?*

The interviewer then said:

*I am now going to show you a display of five logos.  After you have had the time to look at them, I am going to ask you some questions.*

---

[2] According to information posted on their website, Commerce Bank & Trust has been operating in Worcester, MA, since 1955.

[3] In Massachusetts, all respondents saw the CIC logo first, and in the Mid-Atlantic states, all respondents saw the CIS logo first.  In the balance of the country approximately half the respondents saw each logo first.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

When the respondent indicated that they were done looking at the logos, the interviewer asked:

Q3.  *Do you think one or more of these companies are connected or affiliated with the first company I showed you, or none of these companies are connected or affiliated with the first company I showed you[4], or don't you have an opinion?*

Respondents who chose the "one or more of these companies" option were then asked two follow-up questions:

Q4.  *Which of these companies do you think are connected or affiliated with the first company I showed you?  PROBE: Are there any others?*

Q5.  *You said you think that company [INSERT LETTER OF FIRST LOGO CHOSEN] is connected or affiliated with the first company I showed you.  Why do you say that? Please be as specific as possible.  PROBE: Is there anything else?*

A complete copy of the questionnaire used in this study is included in Appendix C.

### Interviewing – A Deviation From Normal Practice

Courts have consistently held that surveys conducted for use in litigation require that the interviewing be done by professional interviewers who are shielded from the client sponsoring the work, from the purpose of the study, and even from the fact that the study is being conducted for litigation.   That is, the interviewing procedures must be "double blind."   In this case, however, counsel for CIC requested, and the court directed, that respondents be read the following notice at the end of the interview:

*You were asked to participate in this survey in connection with a trademark infringement lawsuit.*

*The lawsuit was brought by The Commerce Insurance Company of Webster, Massachusetts against Commerce Bancorp, Inc. and Commerce Insurance Services, Inc. of Cherry Hill, New Jersey.*

*There is no affiliation between The Commerce Insurance Company of Webster, Massachusetts and those other entities.*

---

[4] The first two answer categories (one or more of these companies / none of these companies) were rotated.


CONFIDENTIAL-ATTORNEY'S EYES ONLY

After reading this statement, the interviewers and their supervisors not only know the nature of this case, but also the two parties involved. In our view this is mitigated if not completely removed by the fact that interviewers were never told for which of the two parties the study was being conducted. Moreover, we believe that in this study the interviewer instructions and more importantly the test procedures themselves are transparent, in the sense that an independent observer could not tell which side had commissioned the survey.

A total of 269 interviews were conducted in 15 locations, with 18 interviews completed in each location, except for Colorado.[5] The name and location of each of the interviewing firms used in this study appears below, broken down into the following cells:

a) CIC home market

Five of the interviewing firms are located where CIC currently operates, namely, the state of Massachusetts. In all of the interviews conducted by these firms, respondents saw the Commerce Insurance Company logo in the first room. The names and locations of these firms are:

> Performance Plus – Meadow Glen Mall in Medford, MA (Ballot numbers starting "01")
> Quick Test – Watertown Mall in Watertown, MA (02) – A pilot test was conducted here
> Cunningham Research – Natick Mall in Natick, MA (03)
> Consumer Opinion Center – Eastfield Mall in Springfield, MA (04)
> Car-Lene Research – Silver City Galleria in Taunton, MA (05)

b) CIS home market

Four of the interviewing firms are located where there are currently CIS branches, namely, the Mid-Atlantic states. In all of the interviews conducted by these firms, respondents saw the Commerce Banc Insurance Services logo in the first room. The names and locations of these firms are:

> Quick Test – Sunrise Mall in Massapequa, NY (06)
> Northeast Data – Wayne Towne Center in Wayne, NJ (07)
> Quick Test – Cherry Hill Mall in Cherry Hill, NJ (08)
> Consumer Pulse – Plymouth Meeting Office Center in Plymouth Meeting, PA (09)

---

[5] An interviewer inadvertently showed the wrong logos in one of the interviews. This interview was not included in our tabulation of the results.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

c) The balance of the country

The remaining six interviewing firms were located in areas where there is neither CIC nor a CIS branch. In Salina, KS, all of the respondents saw the Commerce Insurance Company logo in the first room, and in Cedar Park, TX, all of the respondents saw the Commerce Banc Insurance Services logo in the first room. In the remaining four areas, half of the respondents saw the Commerce Insurance Company logo in the first room, and half saw the Commerce Banc Insurance Services logo in the first room. The names and locations of these firms are:

Mid-America Research – Yorktown Center in Lombard, IL (10)
C&C Market Research – Central Mall in Salina, KS (11)
Quick Test – Citrus Park Town Center Mall in Tampa, FL (12)
Quick Test – Lakeline Mall in Cedar Park, TX (13)[6] – A pilot test was conducted here
Consumer Opinion Forum – Southwest Plaza in Littleton, CO (14)
Mid-America Research – Santa Monica Place in Santa Monica, CA (15)

All interviews were conducted in June 2006 by professional interviewers employed by firms that we consider reliable and trustworthy. Aside from their general training and experience as interviewers, each interviewer was provided with a copy of written instructions, which specifically instructed them in the proper procedures for this study. A copy of the instructions is included in Appendix D.

Validation
In order to ensure that the interviewing was carried out as reported, two members of the RL Associates professional staff independently read all of the interviews. This practice allows us to look for patterns in the questionnaires conducted by a particular interviewer (e.g., repetition of an unusual phrase) that indicate that the questionnaires might not have been completed correctly, or were even simply made up by the interviewer.

In addition, at least 20% of each interviewer's work is currently being formally validated by AVC Research, an independent interviewing service located in Belvidere, New Jersey. The purpose of this formal validation is to determine whether the respondent recalled participating in the interview, not to verify a respondent's answers to any particular question. As of this date, it is our opinion that all interviews were carried out according to our instructions.

---

[6] Interviewers in this location inadvertently conducted two interviews with a questionnaire that did not include the notice described above.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

### III – DATA, DISCUSSION AND CONCLUSIONS

<u>Data</u>

a) Recognition of names

A total of 143 respondents (90 in Massachusetts, and 53 outside of Massachusetts) saw the Commerce Insurance Company logo in the first room.  42% of the respondents in Massachusetts said they had heard of the company, while only 4% of the respondents outside of Massachusetts said they had heard of the company.

A total of 126 respondents (72 in the Mid-Atlantic states and 54 outside the Mid-Atlantic states) saw the Commerce Banc Insurance Services logo in the first room.  58% of the respondents in the Mid-Atlantic states said they had heard of the company, while only 7% of the respondents outside the Mid-Atlantic states said they had heard of the company.

b) Likelihood of Connection or Affiliation

The summary table that appears on the next page has three columns of data, broken down by geographic area.  Recall that in Massachusetts, all respondents saw the CIC logo first, and in the Mid-Atlantic states, all respondents saw the CIS logo first.  In the balance of the country approximately half the respondents saw each logo first.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

TABLE I

Q3.  *Do you think one or more of these companies are connected or affiliated with the first company I showed you, or none of these companies are connected or affiliated with the first company I showed you, or don't you have an opinion?*

Q4.  *Which of these companies do you think are connected or affiliated with the first company I showed you?*

|  | Massachusetts | Mid-Atlantic | Balance |
|---|---|---|---|
| Connect Commerce Insurance Company | | | |
| To Commerce Banc Insurance Services | 13% | 12% | 28% |
| | | | |
| Connect first room stimulus to | | | |
| Commerce Bank & Trust | 8% | 15% | 11% |
| Commerce Insurance Services, Inc. | 42% | 25% | 35% |
| The Commerce Bank | 15% | 25% | 13% |
| Bank of Commerce | 9% | 13% | 8% |
| Commerce Bank (Logo H) | 29% | 15% | 17% |
| Commerce Bank (Logo I) | 5% | 15% | 6% |
| | | | |
| All connected or affiliated | 0 | 4% | 4% |
| None connected or affiliated | 37% | 21% | 33% |
| No opinion | 14% | 28% | 9% |

ALL NUMBERS BASED ON
THE NUMBER OF RESPONDENTS WHO SAW A PARTICULAR STIMULUS.

Discussion and Conclusions

As is clear from the first two columns of data, at least for this test protocol, in the home areas of the two organizations (Massachusetts and the Mid-Atlantic states), there is little likelihood of consumers believing the two organizations are connected or affiliated.  In fact, recalling that the control logos used are all from existing banks and/or insurance companies in the United States, the first two columns of data make clear that there is actually significantly less likelihood that consumers in Massachusetts and the Mid-Atlantic states will connect Commerce Insurance Company to Commerce Banc Insurance Services than they will connect other uses of the word "commerce" to either Commerce Insurance Company or Commerce Banc Insurance Services. That is, this data is strong evidence that in the home areas of the two organizations, consumers are less likely to think Commerce Insurance Company and Commerce Banc Insurance Services are connected or affiliated, than either would be to multiple other existing uses of the word "Commerce".

CONFIDENTIAL-ATTORNEY'S EYES ONLY

In the balance of the country, there is somewhat greater likelihood of confusion between the two organizations. However, the actual proportion likely to perceive the organizations as connected or affiliated can be estimated by first estimating the noise based on those respondents who connected one or more of the controls to one of the stimuli of interests. A conservative approach to estimating the noise is to remove the highest and lowest numbers (i.e. the 35% who chose Commerce Insurance Services, Inc. and the 6% who chose one of the Commerce Banks), and averaging the remaining numbers, leading in this case to an average of about (11+13+8+17 / 4 =) 12% noise. The standard procedure for calculating the noise involves subtracting the average of the results for the control stimuli from the results of the stimulus of interest:

Result for test    minus    Avg. result for controls = Net of noise confusion
        28%            -              12%              =           16%

Thus, in the balance of the country, net of noise, 16% of respondents are likely to say that the Commerce Insurance Company and Commerce Banc Insurance Services are connected or affiliated. We draw from this two conclusions.

- Familiarity with either of the two logos significantly reduces the possibility that consumers will perceive them as coming from the same organization.
- The likelihood of confusion even in areas outside both organizations' current service areas is at most in a gray area. Indeed, given the conservative nature of this study, in our experience a number in the mid teens has rarely if ever been held by courts as indicating a substantial likelihood of confusion.

Personnel and Remuneration

Michael Rappeport was responsible for all aspects of this survey. Dr. Rappeport's resume, including cases and publications, is attached as Appendix E.

RL Associates is being compensated $52,900 for this survey. Dr. Rappeport's hourly compensation rate for time spent subsequent to this report is $535/hour.

*Michael Rappeport* June 21, 2006
Michael Rappeport

CONFIDENTIAL-ATTORNEY'S EYES ONLY

APPENDIX A

ROTATION SHEET

CONFIDENTIAL-ATTORNEY'S EYES ONLY

LOGO STUDY – RG702
ROTATION SHEET – LOGO **B** IN THE FIRST ROOM

Before the respondent is even screened, you must set up the display of five logos.  The logos should be arranged on a table in a row in the order described below.  After you have arranged the logos in that order, write your initials next to the rotation number (on the blank line below).  Also, be sure to write both the rotation number and the order of the logos used in the display in the space provided on the questionnaire.

RESPONDENT'S LEFT                                                   RESPONDENT'S RIGHT

| | | | | | |
|---|---|---|---|---|---|
| 1. _____ | C | D | E | I | G |
| 2. _____ | E | C | H | G | F |
| 3. _____ | I | G | C | F | H |
| 4. _____ | G | H | I | C | D |
| 5. _____ | D | F | G | E | C |
| 6. _____ | H | E | F | D | I |
| 7. _____ | C | E | F | D | H |
| 8. _____ | F | C | I | H | G |
| 9. _____ | D | H | C | G | I |
| 10. _____ | H | I | D | C | E |
| 11. _____ | E | G | H | F | C |
| 12. _____ | I | F | G | E | D |
| 13. _____ | C | F | G | E | I |
| 14. _____ | G | C | D | I | H |
| 15. _____ | E | I | C | H | D |
| 16. _____ | I | D | E | C | F |
| 17. _____ | F | H | I | G | C |
| 18. _____ | D | G | H | F | E |

CONFIDENTIAL-ATTORNEY'S EYES ONLY

LOGO STUDY – RG702
ROTATION SHEET – LOGO **C** IN THE FIRST ROOM

Before the respondent is even screened, you must set up the display of five logos.  The logos should be arranged on a table in a row in the order described below.  After you have arranged the logos in that order, write your initials next to the rotation number (on the blank line below).  Also, be sure to write both the rotation number and the order of the logos used in the display in the space provided on the questionnaire.

RESPONDENT'S LEFT                                                    RESPONDENT'S RIGHT

| 1. _____  | B | D | E | I | G |
| 2. _____  | E | B | H | G | F |
| 3. _____  | I | G | B | F | H |
| 4. _____  | G | H | I | B | D |
| 5. _____  | D | F | G | E | B |
| 6. _____  | H | E | F | D | I |
| 7. _____  | B | E | F | D | H |
| 8. _____  | F | B | I | H | G |
| 9. _____  | D | H | B | G | I |
| 10. _____ | H | I | D | B | E |
| 11. _____ | E | G | H | F | B |
| 12. _____ | I | F | G | E | D |
| 13. _____ | B | F | G | E | I |
| 14. _____ | G | B | D | I | H |
| 15. _____ | E | I | B | H | D |
| 16. _____ | I | D | E | B | F |
| 17. _____ | F | H | I | G | B |
| 18. _____ | D | G | H | F | E |

CONFIDENTIAL-ATTORNEYS EYES ONLY

LOGO STUDY – RG702
ROTATION SHEET – LOGO **B** IN THE FIRST ROOM

Before the respondent is even screened, you must set up the display of five logos.  The logos should be arranged on a table in a row in the order described below.  After you have arranged the logos in that order, write your initials next to the rotation number (on the blank line below). Also, be sure to write both the rotation number and the order of the logos used in the display in the space provided on the questionnaire.

RESPONDENT'S LEFT                                    RESPONDENT'S RIGHT

| | | | | | |
|---|---|---|---|---|---|
| 1. ____ | C | D | E | I | G |
| 2. ____ | E | C | H | G | F |
| 3. ____ | I | G | C | F | H |
| 4. ____ | G | H | I | C | D |
| 5. ____ | D | F | G | E | C |
| 6. ____ | H | E | F | D | I |
| 7. ____ | C | E | F | D | H |
| 8. ____ | F | C | I | H | G |
| 9. ____ | D | H | C | G | I |

LOGO **C** IN THE FIRST ROOM

RESPONDENT'S LEFT                                    RESPONDENT'S RIGHT

| | | | | | |
|---|---|---|---|---|---|
| 1. ____ | H | I | D | B | E |
| 2. ____ | E | G | H | F | B |
| 3. ____ | I | F | G | E | D |
| 4. ____ | B | F | G | E | I |
| 5. ____ | G | B | D | I | H |
| 6. ____ | E | I | B | H | D |
| 7. ____ | I | D | E | B | F |
| 8. ____ | F | H | I | G | B |
| 9. ____ | D | G | H | F | E |

CONFIDENTIAL-ATTORNEY'S EYES ONLY

APPENDIX B

LOGOS USED IN THE STUDY

CONFIDENTIAL-ATTORNEY'S EYES ONLY



# Commerce Banc Insurance Services

CONFIDENTIAL-ATTORNEY'S EYES ONLY





CONFIDENTIAL-ATTORNEY'S EYES ONLY



**COMMERCE BANK & TRUST**

CONFIDENTIAL-ATTORNEY'S EYES ONLY





CONFIDENTIAL-ATTORNEY'S EYES ONLY





CONFIDENTIAL-ATTORNEY'S EYES ONLY



CONFIDENTIAL-ATTORNEY'S EYES ONLY





CONFIDENTIAL-ATTORNEY'S EYES ONLY





CONFIDENTIAL-ATTORNEY'S EYES ONLY